

**RECEIVED IN CLERK'S OFFICE**
U.S.D.C. - Atlanta

**AUG 06 2025**

KEVIN P. WEIMER, Clerk
By: *Matthew* Deputy Clerk

# UNITED STATES DISTRICT COURT

# NOTHERN DISTRICT OF GEORGIA

# ATLANTA DIVISION

WILLIE J. MITCHELL (Pro_Se)

   Plaintiffs

-vs-                                                        CIVIL ACTION CASE NO:

THE CITY OF ROSWELL GEORGIA                    **1:25-CV- 4417**

POLICE DEPARTMENT AND  OFFICERS

LT.JASON WESCOTT, ERIN JOHNSON,

JAMES SPIVEY, ASSISTANT SOLICITOR

DEBORAH  L. MELNICK AND JUDGE

MYRA H. DIXON, In their capacity as sworn

United States of America enforcer of the LAW.

     Defendants,

   I Willie J. Mitchell, the Plaintiff do here by serve!  Copy of my complaint to
the above named defendants by the United States Postal Service on this the
4th day of August, 2025.


U.S. Department Of Justice

950 Pennsylvania Avenue NW

Washington DC 20530


Office Of Attorney General

Christopher Carr

4o Capitol Square SW

Atlanta, GA 30334


GA Judicial Qualification Commission

244Washington St SW0303

Suite 440S

Atlanta, GA 30334


Honorable Judge Myra H. Dixion

185 Central Ave SW

Atlanta, GA 30303


State Bar Of Georgia

104 Marietta St. NW

Suite 100

Atlanta, GA 30303


Roswell GA City Attorney

David Davidson

38 Hill St # 110

Roswell,  GA 30075

Respectful Your's

Willie J. Mitchell (Pro-Se)

2104 Wolf Ridge Rd

Apt 18

Whistler, AL 36612

PH: (251)509-6263

Williemitchell1516@yahoo.com

Mitchell, Willie J (MRN E529009) Encounter Date: 09/09/2024

# Mitchell, Willie J

MRN: E529009



**Robert M Hulick, MD**
Physician
Orthopedics

Op Note  📺
Signed

Date of Service: 9/18/2024 11:17 AM



Gulf Orthopaedics

## Operative Report

**9/18/2024**

**Willie J Mitchell**
**311039177**

**Pre Op Dx:** Severe left hip osteoarthritis

**Post Op Dx:** Same

**Procedure:** Left total hip arthroplasty via an anterior approach

**Indications:** Willie J Mitchell is a very pleasant 68 y.o. male that has had longstanding arthritis in the left hip. he has failed conservative management including injections, anti-inflammatories, physical therapy. he has elected to proceed with total hip arthroplasty via an anterior approach.

**Findings:**
Intra-articular findings include : Severe degenerative changes to both the femoral head and acetabulum
Bone quality was judged to be excellent

**Surgeon:** Robert M Hulick, MD I performed this entire procedure from start to finish

**Assistants:** Wesley Carter CRNP was present from before the case started to the end of the case. He was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

**Anesthesia:** SAR

**IVF:** See anesthesia record

**UOP:** See anesthesia record

**Estimated Blood Loss: See anesthesia record**

**Implants:**
**DePuy Actis femoral stem size 9 high offset**
**DePuy ceramic femoral head size 36, +8 mm offset**
**DePuy GRIPTION acetabular shell, 58 mm outside diameter**
**DePuy neutral acetabular polyethylene liner**

Mitchell, Willie J (MRN E529009) Encounter Date: 09/09/2024

**Explants:** None

**Cultures:** None

**Specimens:** None

**Complications:** None

**Counts:** Correct at end of procedure

**Drains:** None

**Procedure Note:** The patient was met preoperatively and all relevant risks and benefits were again discussed. After informed consent was obtained patient was taken to the operating room and underwent general anesthesia without issue. Patient was subsequently placed in supine position and all bony prominences were well-padded. The left lower extremity was prepped and draped in sterile fashion. A preoperative timeout was performed with the circulating nurse, surgeon, and operative team to confirm correct patient, planned procedure, and laterality. When all were in agreement, we proceeded with the planned procedure.

**Operative Narrative:**

Wesley Carter CRNP was present from before the case started to the end of the case. He was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

After obtaining informed consent for the surgery, the risks and benefits of the surgery were explained in detail to the patient and family. The risks include infection, nerve damage, excessive bleeding, the need for transfusion and the risks associated with transfusion, blood vessel damage, loss of limb and amputation, failure of the prosthesis, failure of implant and need for revision arthroplasty, persistent pain, reflex sympathetic dystrophy and/or regional complex pain syndrome, leg length discrepancy, fracture, stiffness and loss of motion, instability, soft tissue impingement and persistent pain, peripheral nerve damage in both upper and/or lower extremities secondary to positioning, Bovie burn, skin and/or wound breakdown due to positioning, DVT, PE, risks associated with anesthesia, coronary arrest, death, progressive and/or accelerated degeneration of the opposite compartment. The patient and family stated they fully understand the risks and benefits of surgery and wish to proceed with surgery to include left total hip arthroplasty

The patient was identified in the pre-operative holding area. Chart review was performed, and the operative site marked with patient confirmation. The patient was then brought to the operative room, and placed in the supine position. Anesthesia was administered, and the patient was transferred to the HANA Hip Operating Table, with both feet placed in boots, and the padded perineal post positioned carefully. Preoperative antibiotics and transexamic acid were given. Sterile prepping and draping was then performed for surgery on the marked hip using an alcohol/iodine prep, and an occlusive drape. A preoperative timeout was performed with the circulating nurse, surgeon, and operative team to confirm correct patient, planned procedure, and laterality. When all were in agreement, we proceeded with the planned procedure.

Approximately 10cm incision was then on the anterolateral hip surface, 3 centimeters lateral and 1 centimeter distal to the ASIS, overlying the TFL muscle belly. Soft tissue dissection was performed down to the anterior fascia of the hip. An incision was made in the lateral aspect of the TFL muscle fascia. Blunt finger dissection was then done down between the TFL and the sartorious muscle bellies down to the anterior hip capsule. A blunt Hohmann retractor was placed over the superior femoral neck. Sharp dissection with Metzenbaum scissors was then used to open the fascia overlying the rectus femoris and vastus lateralis.

The ascending branch of the lateral femoral circumflex artery and its accompanying veins were identified and coagulated with Bovie electrocautery. The rectus femoris and iliocapsularis were then elevated off the anterior hip capsule and a double bent Hohmann retractor was placed over the anterior rim of the acetabulum. A blunt Hohmann retractor was then placed inferior to the femoral neck and capsule. Blunt Hohman retractors were placed above and below the femoral neck and it's capsule. A capsulotomy was then performed along the lateral border of the anterior capsule from the top to the bottom of the femoral neck. The capsule was then freed from the anterior neck, and joint fluid removed with suction. A transverse incision in the capsule was then performed along the base of the femoral neck. The capsular flaps were then tagged with 0 Vicryl. The blunt Hohmann retractors were then placed intracapsular superior and inferior to the femoral neck.

The hip was then externally rotated 15 degrees with 2 turns of traction on the Hana table. At this point, 2 osteotomies were performed on the femoral neck, one at the base of the head, and one at the base of the superior femoral neck. The hip was externally rotated once again to 30 degrees, and the "napkin ring" segment of femoral neck was removed with a Cobb elevator, and larger rongeur. The corkscrew was then placed, rotating the femoral head several times, causing avulsion of the ligamentum teres. The femoral head was then removed.

Traction was removed, and retractors were placed over the anterior and posterior rims of the acetabulum, giving exposure to the cup. Any additional inferior capsule attached to the inferior neck was released. Once exposure was obtained, the labrum and foveal contents were removed with bovie and foveal pickups. Any overhanging osteophytes were removed with an osteotome and mallet. Reamer was then used to medialize the acetabulum down to the base of the fovea. Great care was taken not to over ream and over medialize with this reamer. Sequential reaming was then performed to 58 millimeters with hemispherical reamers, to the point that all the cartilage, and irregular surfaces were removed. The screening was done under the guidance of fluoroscopy to ensure appropriate abduction angle, version, and overall orientation. Once the reaming was completed, a 58 millimeter acetabular cup was impacted into the acetabulum under fluoroscopy, aiming for approximately 40 degrees of abduction, and 15 degrees of anteversion. Once the cup impaction was completed, a neutral offset polyethylene liner was placed into the cup, and impacted into place. The 2 retractors were then removed.

Lack of traction was confirmed. The hip was fully externally rotated, extended to the floor, and adducted underneath the other foot. The traction arm was checked to ensure that there was no unexpected traction on the leg. A retractor was placed medially, and another one placed over the tip of the trochanter. The superior capsule was excised down the lateral femoral neck to the trochanter. Careful release of the remaining capsule was performed around the femoral neck until appropriate mobilization occurred, and the femoral hook was elevated slightly to enhance exposure. Broaching was done carefully so as to not cause a fracture in the femoral calcar. Sequential broaching was performed to a size 9. Trials were then performed with different femoral necks, and head ball neck lengths. The C-Arm was used during the trial reductions checking canal fill, leg length and hip offset. Adjustments in implant size were made as needed based on information from the navigation system. A size Actis 9 high offset stem was chosen, and impacted into the femur. The femoral calcar was carefully inspected to ensure there was no fracture. A 36 millimeter ceramic head ball with +8 neck length was chosen, and attached to the femoral stem, then impacted into place. All retractors were removed. The hip was then reduced, and a final fluoroscopic imaging was obtained to ensure appropriate implant placement.

Thorough irrigation of the surgical site was performed. The soft tissues were inspected for any discrete bleeding. The anterior hip capsule was repaired. The muscles were allowed to fall back into position. The anterior fascia was closed with #2 strata fix, subcutaneous tissues closed with 2-0 Monocryl, and skin closed with 3-0 strata fix. Prineo skin glue system followed by silver bearing dressing were then applied. At the conclusion of the case all counts are correct. The patient was then awakened from general anesthesia and transported to the postoperative care area having tolerated procedure well

Postoperatively: The patient will be on 24 hours of overnight antibiotics. Multimodal pain control regimen has been initiated. Patient will mobilize with physical therapy as quickly as possible with plan for discharge on postoperative day 1. Graduated compression stockings, sequential compression device, and aspirin 81 mg twice daily for 5 weeks for DVT Ppx. Weightbearing as tolerated, anterior precautions. PT to evaluate patient for any discharge disposition needs, CM/SW to assist with any discharge disposition needs. Patient will follow-up with me in clinic in 2 weeks for wound evaluation.

Mitchell, Willie J (MRN E529009) Encounter Date: 09/09/2024

A 22 modifier has been added to this procedure secondary to the work performed was significantly greater than that usually performed for this procedure.

Due to the patient's BMI of 35 and significant musculature of the thigh, the patient required at least double the number of assistants for preoperative positioning, sterile preparation and drape of the injured extremity, and to hold retractors intraoperatively. The subcutaneous fat and significant musculature of the thigh required significant effort to retract, in addition to prolonged dissection with increased blood loss secondary to vascularity of the subcutaneous fat. The additional time incurred for this procedure was estimated to be 1.5 hours

Copies of preoperative and postoperative radiographs are available upon request and I would be happy to speak with designated representative regarding this modifier if necessary to further explain the difficulty of the procedure undertaken far outside the normal spectrum for the listed CPT codes.

**Compliations:** None

**Specimens:** None

**Estimated Blood Loss:** 300-400

**VTE Prophylaxis:** As ordered postop

**Disposition:** PACU

MD interpretation of fluoroscopy directly necessary intraoperatively in order to assess alignment and fixation stability. This was a dynamic process involving interpretation of the fracture pattern, reduction of the fracture, and safe implant placement. Additionally, final fluoroscopic evaluation was used to determine restoration of length, alignment, and rotation. These factors were directly assessed based on my evaluation of the fluoroscopic images.

**Disposition:** Postoperatively: The patient will be on 24 hours of overnight antibiotics. Multimodal pain control regimen has been initiated. Patient will mobilize with physical therapy as quickly as possible with plan for discharge on postoperative day 1. Graduated compression stockings, sequential compression device, and aspirin 81 mg twice daily for 5 weeks for DVT Ppx. Weightbearing as tolerated, anterior precautions. PT to evaluate patient for any discharge disposition needs, CM/SW to assist with any discharge disposition needs. Patient will follow-up with me in clinic in 2 weeks for wound evaluation.

Electronically signed by Robert M Hulick, MD at 9/18/2024 11:21 AM

Admission (Discharged) on 9/18/2024   *Note shared with patient*

## Care Timeline

| | |
|---|---|
| 09/18 0534 | Admitted (Observation) 0534 |
| 09/18 0708 | LEFT HIP ARTHROPLASTY (TOTAL) ANTERIOR |
| 09/20 1420 | Discharged 1420 |

4/15/25, 11:15 AM

Mitchell, Willie J (MRN E529009) Encounter Date: 02/25/2025

# Mitchell, Willie J

MRN: E529009



**Robert M Hulick, MD**
Physician
Orthopedics

Op Note 
Addendum

Date of Service: 3/5/2025 11:05 AM

## Gulf Orthopaedics

### Operative Note

**Date of surgery: 03/05/25**

**Pre-procedure Diagnosis:** Right knee osteoarthritis

**Post-procedure Diagnosis:** same as pre-op diagnosis

**Procedure Performed:**
Right Total Knee arthroplasty

**Anesthesia:** Spinal

**Surgeon: R. Miles Hulick**
  **Assistant(s): M. Wesley Carter CNRP** was present for positioning help prior to the
case and was present through the end of the case. He was instrumental in the
positioning of the patient, the approach to the extremity, and during the placement of the
components. Ability to achieve proper alignment of the components was significantly
improved with his assistance. Without his presence, anesthesia time would have been
increased which has been shown to increase complication rates - including infection risk
and wound complications. He also helped ensure an excellent closure of the wound.

**Operative Narrative:**
After obtaining informed consent for the surgery, the risks and benefits of the surgery
were explained in detail to the patient and family.  The risks include infection, nerve
damage, excessive bleeding, the need for transfusion and the risks associated with
transfusion, blood vessel damage, loss of limb and amputation, failure of the prosthesis,
failure of implant and need for revision total knee arthroplasty, persistent pain, reflex
sympathetic dystrophy and/or regional complex pain syndrome, leg length discrepancy,
fracture, stiffness and loss of motion, instability, soft tissue impingement and persistent
pain, peripheral nerve damage in both upper and/or lower extremities secondary to
positioning, Bovie burn, skin and/or wound breakdown due to positioning, DVT, PE, risks
associated with anesthesia, coronary arrest, death, progressive and/or accelerated
degeneration of the opposite compartment.  The patient and family stated they fully
understand the risks and benefits of surgery and wish to proceed with surgery to include
left total knee arthroplasty.

  The patient was identified in the Pre-Op Holding area.  Chart review was performed,
and the operative site was marked, with the patient's confirmation, with my initials.  The
patient was then brought to the operative suite, and placed in the supine position.
Anesthesia was administered. All bony prominences were padded. The operative leg
was then prepped using an alcohol/iodine prep solution, and then draped in the usual
sterile fashion with drapes, and an occlusive wrap over the incision site. The foot was

Mitchell, Willie J (MRN E529009) Printed by Effect...

Mitchell, Willie J (MRN E529009) Encounter Date: 02/25/2025

then positioned with the help of a sand bag. 1g of transexamic acid was administered.

Time out procedure was then called, with concurrence of the anesthetist, circulating nurse, and myself as to the surgical site, surgery to be performed, and pre-operative antibiotics given. The tourniquet was then applied.

A straight anterior midline incision was made from just below the tibial tubercle to an inch or so above the superior pole of the patella. Appropriate skin flaps were developed. A para-patellar arthrotomy was performed, and extended along the medial border of the patellar tendon. Any vessel lumens, or bleeding points were treated with the bovie device.

Intra-articular findings include : severe degenerative changes, eburnated bone medially, genu varus, and flexion contracture.

With the knee in extension the patella was mobilized by fat pad excision, and removal of synovium from the periphery of the patella, exposing the quad and patellar tendon insertions. The patella was then subluxed laterally as the knee was brought into flexion. Due to the significant tightness of the knee with limited soft tissue excursion, I first cut the patella to free up more space and placed the metal protection button.

The deep fibers of the medial collateral ligament were released from the medial aspect of the tibia, and underlying osteophytes were removed with a rongeur. Due to the significant varus deformity of the knee, the medial peel was taken further posteriorly to the midline of the tibia to release more of the superficial MCL. The anterior and posterior cruciate ligaments were excised. The medial and lateral menisci were removed with a bovie with care taken to not damage the collateral ligaments, and popliteal tendon. The bovie was used to cauterize the bed of the lateral meniscus to catch the artery entrance there.

OrthAlign was used to resect the proximal tibia preferentially in 1 to 2 degrees of varus to open the medial compartment. Additionally a medial reduction osteotomy was performed excising excess medial tibia in an effort to create more space in the medial compartment.

Similarly, OrthAlign navigation guides and the Depuy guides were used to resect the distal femur for a size 7 cruciate retaining femoral component. Posterior osteophytes were removed with a curved osteotome, and the posterior joint space was searched for loose bodies.

Then, I punched the proximal tibia appropriately for a size 7 tibial component, Depuy fixed bearing design. Spurs were then removed to the level of the trials, on both the femoral and tibial sides with a rongeur. Due to the severity of the deformity as well as the patient's overall size I elected to place a short stem on the tibial component. The tibial component was reamed to allow for 50 mm stem. Eburnated bone was "aerated" with a drill point to aid with cementation.

With the trial femoral and tibial components in place, trials of inserts were performed, demonstrating the 5 mm insert to be the correct size. During the trials fine points of ligamentous balancing were performed with additional releases as needed, and excision of redundant synovium. The lateral retinaculum was also inspected, with release of the synovium which bound the retinaculum to the lateral femoral condyle and to the popliteus.

The patella was then osteotomized parallel to its anterior surface with an oscillating saw, leaving a 13 mm thick wafer of bone. It was then sized, and drilled appropriately for a 35 mm patellar component. A patella trial was applied to the cut surface of the patella.

At the completion of the trials, range of motion, stability and alignment were all excellent.

Once all the balancing procedures were complete, the trial components were removed. 40mL of local anesthetic was placed in the posterior capsule and surrounding tissues. Aspiration was performed prior to injection posteriorly to ensure that blood vessels were avoided. All cut bony surfaces were cleansed with a jet driven irrigation device, using irrigation fluid. The femoral, tibial and patellar surfaces were then sequentially cleaned and dried. The femoral component was placed without cement and tibial components were placed with cement.

The knee was then placed into extension, and the patellar component was cemented in, using the patellar clamp to apply continuous pressure. Excess cement was removed with a Freer elevator and curettes. The cement was allowed to harden. The insert trial was removed, and replaced with the real insert, which was locked into place. Range of motion, and stability checking were once again performed, and were excellent.

Thorough irrigation of the surgical site was performed with normal saline solution. A final look for bleeding points was repeated. The retinaculum was then closed, starting with a figure of 8 stitch of #1 vicryl, placed just proximal to the patella. The retinaculum was then closed with #2 Quill suture, in a running fashion with over-sewing. The soft tissues were then closed with 2-0 monocryl and 3-0 stratafix in running subcuticular fashion. A silver bearing dressing was applied, with an Ace Wrap/TED hose applied from the toes to the upper thigh. The tourniquet was deflated during the procedure. The patient was then awakened from anesthesia, and transferred to the stretcher.

IMPLANTS:
Depuy Attune Femur size 7 cementless
DePuy attune tibia size 7 fixed-bearing, 50 mm stem
DePuy attune patella size 35
DePuy attune tibial insert size 7 x 5 mm

A 22 modifier will be applied to this case secondary to the significant increase in complexity due to the patient's pre-existing significant varus deformity necessitating alteration in bony cuts including preferential varus tibia resection as well as a medial tibial reduction osteotomy and additional medial peel to free up the MCL and allow for a stable extension gap. Additionally, the patient's overall size and limited soft tissue excursion significantly increased the complexity and time required for this case. Overall additional time required for this case over 1 hour

**Complications:** None

**Specimens:** None

**Estimated Blood Loss:** less than 50 ml

**VTE Prophylaxis:** As ordered post-op

**Disposition:** Postoperatively, patient will be taken to the postoperative care area. Will plan for admission to 23-hour observation. Patient will work with physical therapy today at least once, possibly twice pending timing and staff availability. Patient will work with physical therapy again tomorrow at least once prior to discharge. Aspirin 81 mg twice daily for DVT prophylaxis. Follow-up with me in 2 weeks in Mobile

Electronically signed by *No name on file* 3/5/2025 11:05 AM

Electronically signed by Robert M Hulick, MD at 3/5/2025 4:12 PM

Admission (Discharged) on 3/5/2025    *Note shared with patient*

4/15/25, 11:15 AM

Mitchell, Willie J (MRN E529009) Encounter Date: 02/25/2025

## Care Timeline

03/05  Admitted (Observation) 0545
0545

03/05  RIGHT TOTAL KNEE REPLACEMENT
0703

03/05  Discharged 1420
1420

# Responsible Party Ledger

**Saraland Smiles**
1097 Industrial Parkway, Ste. E
Saraland, AL 36571
Ph : 251-675-3070

| | |
|---|---|
| Date : | 4/15/2025 |
| Account # : | 90057171 |
| Account Balance : | 2,312.00 |
| Billing Type : | Collection |
| Office # : | SRL305 |

WILLIE  MITCHELL
2104 WOLF RIDGE RD
APT 18
WHISTLER, AL 36612

Tuesday, April 15, 2025

| Date | Chart# | Patient Name | Th | Surf | Prdr | Code | Description | Charges | Credits | Curr. Bal. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **Previous Balance** | **20.00** | | |
| 6/15/2023 | | Mitchell, Willie | | | 1351 | PP010 | PMT PAT-Direct Deposit... | | -20.00 | 0.00 |
| | | Mitchell, Willie | 18 | | 0950 | D6740 | Retainer Crown - Porce... | 781.00 | | 781.00 |
| | | Mitchell, Willie | 19 | | 0950 | D6245 | Pontic Porcelain/Ceram... | 778.00 | | 1,559.00 |
| | | Mitchell, Willie | 20 | | 0950 | D6740 | Retainer Crown - Porce... | 781.00 | | 2,340.00 |
| | | Mitchell, Willie | | | 1351 | D1110 | Prophylaxis - Adult | 64.00 | | 2,404.00 |
| | | Mitchell, Willie | | | 1351 | D1206 | Topical Application Of... | 29.00 | | 2,433.00 |
| 6/16/2023 | | Mitchell, Willie | | | MDP-AL | CLM-P | Pri Claim - Sent (2433.00) Closed: 06/27/2023 | | 0.00 | 2,433.00 |
| 6/24/2023 | | Mitchell, Willie | | | *** | PINS8 | PMT INS - ERA 835 (Dos:06/15/23) | | -29.00 | 2,404.00 |
| 7/7/2023 | | Mitchell, Willie | | | 0950 | PP010 | PMT PAT-Direct Deposit... | | -92.00 | 2,312.00 |
| | | Mitchell, Willie | 18 | | 0950 | ZD0101 | Deliver Bridge | 0.00 | | 2,312.00 |
| | | | | | | | **Total :** | **2,433.00** | **-141.00** | |

Account Balance  as of  7/7/2023    : 2,312.00

Summary :

| | |
|---|---|
| Total Charges : | 2,433.00 |
| Total Payments : | -141.00 |
| Total Adjustments : | 0.00 |

Family Member Balances as of:  7/7/2023
Willie  Mitchell :        2,312.00

YTD Charges : 2,765.00        YTD Pat Payments : 112.00        YTD Ins Payments : 341.00

Page 1

# Mitchell, Willie J

MRN: E529009

 **Robert M Hulick, MD**
Physician
Orthopedics

Op Note  Signed

Date of Service: 9/18/2024 11:17 AM



Gulf Orthopaedics

## Operative Report

**9/18/2024**

## Willie J Mitchell
**311039177**

**Pre Op Dx:** Severe left hip osteoarthritis

**Post Op Dx:** Same

**Procedure:** Left total hip arthroplasty via an anterior approach

**Indications:** Willie J Mitchell is a very pleasant 68 y.o. male that has had longstanding arthritis in the left hip. he has failed conservative management including injections, anti-inflammatories, physical therapy. he has elected to proceed with total hip arthroplasty via an anterior approach.

**Findings:**
Intra-articular findings include : Severe degenerative changes to both the femoral head and acetabulum Bone quality was judged to be excellent

**Surgeon:** Robert M Hulick, MD I performed this entire procedure from start to finish

**Assistants:** Wesley Carter CRNP was present from before the case started to the end of the case. He was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

**Anesthesia:** SAR

**IVF:** See anesthesia record

**UOP:** See anesthesia record

**Estimated Blood Loss:** See anesthesia record

**Implants:**
DePuy Actis femoral stem size 9 high offset
DePuy ceramic femoral head size 36, +8 mm offset
DePuy GRIPTION acetabular shell, 58 mm outside diameter
DePuy neutral acetabular polyethylene liner

**Explants:** None

**Cultures:** None

**Specimens:** None

**Complications:** None

**Counts:** Correct at end of procedure

**Drains:** None

**Procedure Note:** The patient was met preoperatively and all relevant risks and benefits were again discussed. After informed consent was obtained patient was taken to the operating room and underwent general anesthesia without issue. Patient was subsequently placed in supine position and all bony prominences were well-padded. The left lower extremity was prepped and draped in sterile fashion. A preoperative timeout was performed with the circulating nurse, surgeon, and operative team to confirm correct patient, planned procedure, and laterality. When all were in agreement, we proceeded with the planned procedure.

**Operative Narrative:**

Wesley Carter CRNP was present from before the case started to the end of the case. He was present for positioning help prior to the case and was present through the end of the case. He was instrumental in the positioning of the patient, the approach to the extremity, and during the placement of the components. Ability to achieve proper alignment of the components was significantly improved with his assistance. Without his presence, anesthesia time would have been increased which has been shown to increase complication rates - including infection risk and wound complications. He also helped ensure an excellent closure of the wound.

After obtaining informed consent for the surgery, the risks and benefits of the surgery were explained in detail to the patient and family. The risks include infection, nerve damage, excessive bleeding, the need for transfusion and the risks associated with transfusion, blood vessel damage, loss of limb and amputation, failure of the prosthesis, failure of implant and need for revision arthroplasty, persistent pain, reflex sympathetic dystrophy and/or regional complex pain syndrome, leg length discrepancy, fracture, stiffness and loss of motion, instability, soft tissue impingement and persistent pain, peripheral nerve damage in both upper and/or lower extremities secondary to positioning, Bovie burn, skin and/or wound breakdown due to positioning, DVT, PE, risks associated with anesthesia, coronary arrest, death, progressive and/or accelerated degeneration of the opposite compartment. The patient and family stated they fully understand the risks and benefits of surgery and wish to proceed with surgery to include left total hip arthroplasty

The patient was identified in the pre-operative holding area. Chart review was performed, and the operative site marked with patient confirmation. The patient was then brought to the operative room, and placed in the supine position. Anesthesia was administered, and the patient was transferred to the HANA Hip Operating Table, with both feet placed in boots, and the padded perineal post positioned carefully. Preoperative antibiotics and transexamic acid were given. Sterile prepping and draping was then performed for surgery on the marked hip using an alcohol/iodine prep, and an occlusive drape. A preoperative timeout was performed with the circulating nurse, surgeon, and operative team to confirm correct patient, planned procedure, and laterality. When all were in agreement, we proceeded with the planned procedure.

Approximately 10cm incision was then on the anterolateral hip surface, 3 centimeters lateral and 1 centimeter distal to the ASIS, overlying the TFL muscle belly. Soft tissue dissection was performed down to the anterior fascia of the hip. An incision was made in the lateral aspect of the TFL muscle fascia. Blunt finger dissection was then down between the TFL and the sartorious muscle bellies down to the anterior hip capsule. A blunt Hohmann retractor was placed over the superior femoral neck. Sharp dissection with Metzenbaum scissors was then used to open the fascia overlying the rectus femoris and vastus lateralis.

The ascending branch of the lateral femoral circumflex artery and its accompanying veins were identified and coagulated with Bovie electrocautery. The rectus femoris and iliocapsularis were then elevated off the anterior hip capsule and a double bent Hohmann retractor was placed over the anterior rim of the acetabulum. A blunt Hohmann retractor was then placed inferior to the femoral neck and capsule. Blunt Hohman retractors were placed above and below the femoral neck and it's capsule. A capsulotomy was then performed along the lateral border of the anterior capsule from the top to the bottom of the femoral neck. The capsule was then freed from the anterior neck, and joint fluid removed with suction. A transverse incision in the capsule was then performed along the base of the femoral neck. The capsular flaps were then tagged with 0 Vicryl. The blunt Hohmann retractors were then placed intracapsular superior and inferior to the femoral neck.

The hip was then externally rotated 15 degrees with 2 turns of traction on the Hana table. At this point, 2 osteotomies were performed on the femoral neck, one at the base of the head, and one at the base of the superior femoral neck. The hip was externally rotated once again to 30 degrees, and the "napkin ring" segment of femoral neck was removed with a Cobb elevator, and larger rongeur. The corkscrew was then placed, rotating the femoral head several times, causing avulsion of the ligamentum teres. The femoral head was then removed.

Traction was removed, and retractors were placed over the anterior and posterior rims of the acetabulum, giving exposure to the cup. Any additional inferior capsule attached to the inferior neck was released. Once exposure was obtained, the labrum and foveal contents were removed with bovie, and deep pickups. Any overhanging osteophytes were removed with an osteotome and mallet. Reamer was then used to medialize the acetabulum down to the base of the fovea. Great care was taken not to over ream and over medialize with this reamer. Sequential reaming was then performed to 58 millimeters with hemispherical reamers, to the point that all the cartilage, and irregular surfaces were removed. The screening was done under the guidance of fluoroscopy to ensure appropriate abduction angle, version, and overall orientation. Once the reaming was completed, a 58 millimeter acetabular cup was impacted into the acetabulum under fluoroscopy, aiming for approximately 40 degrees of abduction, and 15 degrees of anteversion. Once the cup impaction was completed, a neutral offset polyethylene liner was placed into the cup, and impacted into place. The 2 retractors were then removed.

Lack of traction was confirmed. The hip was fully externally rotated, extended to the floor, and adducted underneath the other foot. The traction arm was checked to ensure that there was no unexpected traction on the leg. A retractor was placed medially, and another one placed over the tip of the trochanter. The superior capsule was excised down the lateral femoral neck to the trochanter. Careful release of the remaining capsule was performed around the femoral neck until appropriate mobilization occurred, and the femoral hook was elevated slightly to enhance exposure. Broaching was done carefully so as to not cause a fracture in the femoral calcar. Sequential broaching was performed to a size 9. Trials were then performed with different femoral necks, and head ball neck lengths. The C-Arm was used during the trial reductions checking canal fill, leg length and hip offset. Adjustments in implant size were made as needed based on information from the navigation system. A size Actis 9 high offset stem was chosen, and impacted into the femur. The femoral calcar was carefully inspected to ensure there was no fracture. A 36 millimeter ceramic head ball with +8 neck length was chosen, and attached to the femoral stem, then impacted into place. All retractors were removed. The hip was then reduced, and a final fluoroscopic imaging was obtained to ensure appropriate implant placement.

Thorough irrigation of the surgical site was performed. The soft tissues were inspected for any discrete bleeding. The anterior hip capsule was repaired. The muscles were allowed to fall back into position. The anterior fascia was closed with #2 strata fix, subcutaneous tissues closed with 2-0 Monocryl, and skin closed with 3-0 strata fix. Prineo skin glue system followed by silver bearing dressing were then applied. At the conclusion of the case all counts are correct. The patient was then awakened from general anesthesia and transported to the postoperative care area having tolerated procedure well

Postoperatively: The patient will be on 24 hours of overnight antibiotics. Multimodal pain control regimen has been initiated. Patient will mobilize with physical therapy as quickly as possible with plan for discharge on postoperative day 1. Graduated compression stockings, sequential compression device, and aspirin 81 mg twice daily for 5 weeks for DVT Ppx. Weightbearing as tolerated, anterior precautions. PT to evaluate patient for any discharge disposition needs, CM/SW to assist with any discharge disposition needs. Patient will follow-up with me in clinic in 2 weeks for wound evaluation.

A 22 modifier has been added to this procedure secondary to the work performed was significantly greater than that usually performed for this procedure.

Due to the patient's BMI of 35 and significant musculature of the thigh, the patient required at least double the number of assistants for preoperative positioning, sterile preparation and drape of the injured extremity, and to hold retractors intraoperatively. The subcutaneous fat and significant musculature of the thigh required significant effort to retract, in addition to prolonged dissection with increased blood loss secondary to vascularity of the subcutaneous fat. The additional time incurred for this procedure was estimated to be 1.5 hours

Copies of preoperative and postoperative radiographs are available upon request and I would be happy to speak with designated representative regarding this modifier if necessary to further explain the difficultly of the procedure undertaken far outside the normal spectrum for the listed CPT codes.

**Compliations:** None

**Specimens:** None

**Estimated Blood Loss:** 300-400

**VTE Prophylaxis:** As ordered postop

**Disposition:** PACU

MD interpretation of fluoroscopy directly necessary intraoperatively in order to assess alignment and fixation stability. This is a dynamic process involving interpretation of the fracture pattern, reduction of the fracture, and safe implant placement. Additionally, final fluoroscopic evaluation was used to determine restoration of length, alignment, and rotation. These factors were directly assessed based on my evaluation of the fluoroscopic images.

**Disposition:** Postoperatively: The patient will be on 24 hours of overnight antibiotics. Multimodal pain control regimen has been initiated. Patient will mobilize with physical therapy as quickly as possible with plan for discharge on postoperative day 1. Graduated compression stockings, sequential compression device, and aspirin 81 mg twice daily for 5 weeks for DVT Ppx. Weightbearing as tolerated, anterior precautions. PT to evaluate patient for any discharge disposition needs, CM/SW to assist with any discharge disposition needs. Patient will follow-up with me in clinic in 2 weeks for wound evaluation.

Electronically signed by Robert M Hulick, MD at 9/18/2024 11:21 AM

Admission (Discharged) on 9/18/2024   *Note shared with patient*

## Care Timeline

| | |
|---|---|
| 09/18 0534 | Admitted (Observation) 0534 |
| 09/18 0708 | LEFT HIP ARTHROPLASTY (TOTAL) ANTERIOR |
| 09/20 1420 | Discharged 1420 |

# Mitchell, Willie J

MRN: E529009



**Robert M Hulick, MD**
Physician
Orthopedics

Op Note 📝
Addendum

Date of Service: 3/5/2025 11:05 AM



Gulf Orthopaedics

**Operative Note**

**Date of surgery: 03/05/25**

**Pre-procedure Diagnosis:**  Right  knee osteoarthritis

**Post-procedure Diagnosis:** same as pre-op diagnosis

**Procedure Performed:**
Right Total Knee arthroplasty

**Anesthesia:** Spinal

**Surgeon: R. Miles Hulick**
  **Assistant(s): M. Wesley Carter CNRP** was present for positioning help prior to the
case and was present through the end of the case. He was instrumental in the
positioning of the patient, the approach to the extremity, and during the placement of the
components. Ability to achieve proper alignment of the components was significantly
improved with his assistance. Without his presence, anesthesia time would have been
increased which has been shown to increase complication rates - including infection risk
and wound complications. He also helped ensure an excellent closure of the wound.

**Operative Narrative:**
After obtaining informed consent for the surgery, the risks and benefits of the surgery
were explained in detail to the patient and family.  The risks include infection, nerve
damage, excessive bleeding, the need for transfusion and the risks associated with
transfusion, blood vessel damage, loss of limb and amputation, failure of the prosthesis,
failure of implant and need for revision total knee arthroplasty, persistent pain, reflex
sympathetic dystrophy and/or regional complex pain syndrome, leg length discrepancy,
fracture, stiffness and loss of motion, instability, soft tissue impingement and persistent
pain, peripheral nerve damage in both upper and/or lower extremities secondary to
positioning, Bovie burn, skin and/or wound breakdown due to positioning, DVT, PE, risks
associated with anesthesia, coronary arrest, death, progressive and/or  accelerated
degeneration of the opposite compartment.  The patient and family stated they fully
understand the risks and benefits of surgery and wish to proceed with surgery to include
left total knee arthroplasty.

  The patient was identified in the Pre-Op Holding area.  Chart review was performed,
and the operative site was marked, with the patient's confirmation, with my initials.  The
patient was then brought to the operative suite, and placed in the supine position.
Anesthesia was administered.  All bony prominences were padded.  The operative leg
was then prepped using an alcohol/iodine prep solution, and then draped in the usual
sterile fashion with drapes, and an occlusive wrap over the incision site.  The foot was

then positioned with the help of a sand bag. 1g of transexamic acid was administered.

Time out procedure was then called, with concurrence of the anesthetist, circulating nurse, and myself as to the surgical site, surgery to be performed, and pre-operative antibiotics given. The tourniquet was then applied.

A straight anterior midline incision was made from just below the tibial tubercle to an inch or so above the superior pole of the patella. Appropriate skin flaps were developed. A para-patellar arthrotomy was performed, and extended along the medial border of the patellar tendon. Any vessel lumens, or bleeding points were treated with the bovie device.

Intra-articular findings include : severe degenerative changes, eburnated bone medially, genu varus, and flexion contracture.

With the knee in extension the patella was mobilized by fat pad excision, and removal of synovium from the periphery of the patella, exposing the quad and patellar tendon insertions. The patella was then subluxed laterally as the knee was brought into flexion. Due to the significant tightness of the knee with limited soft tissue excursion, I first cut the patella to free up more space and placed the metal protection button.

The deep fibers of the medial collateral ligament were released from the medial aspect of the tibia, and underlying osteophytes were removed with a rongeur. Due to the significant varus deformity of the knee, the medial peel was taken further posteriorly to the midline of the tibia to release more of the superficial MCL. The anterior and posterior cruciate ligaments were excised. The medial and lateral menisci were removed with a bovie with care taken to not damage the collateral ligaments, and popliteal tendon. The bovie was used to cauterize the bed of the lateral meniscus to catch the artery entrance there.

OrthAlign was used to resect the proximal tibia preferentially in 1 to 2 degrees of varus to open the medial compartment. Additionally a medial reduction osteotomy was performed excising excess medial tibia in an effort to create more space in the medial compartment.

Similarly, OrthAlign navigation guides and the Depuy guides were used to resect the distal femur for a size 7 cruciate retaining femoral component. Posterior osteophytes were removed with a curved osteotome, and the posterior joint space was searched for loose bodies.

Then, I punched the proximal tibia appropriately for a size 7 tibial component, Depuy fixed bearing design. Spurs were then removed to the level of the trials, on both the femoral and tibial sides with a rongeur. Due to the severity of the deformity as well as the patient's overall size I elected to place a short stem on the tibial component. The tibial component was reamed to allow for 50 mm stem. Eburnated bone was "aerated" with a drill point to aid with cementation.

With the trial femoral and tibial components in place, trials of inserts were performed, demonstrating the 5 mm insert to be the correct size. During the trials fine points of ligamentous balancing were performed with additional releases as needed, and excision of redundant synovium. The lateral retinaculum was also inspected, with release of the synovium which bound the retinaculum to the lateral femoral condyle and to the popliteus.

The patella was then osteotomized parallel to its anterior surface with an oscillating saw, leaving a 13 mm thick wafer of bone. It was then sized, and drilled appropriately for a 35 mm patellar component. A patella trial was applied to the cut surface of the patella.

At the completion of the trials, range of motion, stability and alignment were all excellent.

Once all the balancing procedures were complete, the trial components were removed. 40mL of local anesthetic was placed in the posterior capsule and surrounding tissues. Aspiration was performed prior to injection posteriorly to ensure that blood vessels were avoided. All cut bony surfaces were cleansed with a jet driven irrigation device, using irrigation fluid. The femoral, tibial and patellar surfaces were then sequentially cleaned and dried. The femoral component was placed without cement and tibial components were placed with cement.

The knee was then placed into extension, and the patellar component was cemented in, using the patellar clamp to apply continuous pressure. Excess cement was removed with a Freer elevator and curettes. The cement was allowed to harden. The insert trial was removed, and replaced with the real insert, which was locked into place. Range of motion, and stability checking were once again performed, and were excellent.

Thorough irrigation of the surgical site was performed with normal saline solution. A final look for bleeding points was repeated. The retinaculum was then closed, starting with a figure of 8 stitch of #1 vicryl, placed just proximal to the patella. The retinaculum was then closed with #2 Quill suture, in a running fashion with over-sewing. The soft tissues were then closed with 2-0 monocryl and 3-0 stratafix in running subcuticular fashion. A silver bearing dressing was applied, with an Ace Wrap/TED hose applied from the toes to the upper thigh. The tourniquet was deflated during the procedure. The patient was then awakened from anesthesia, and transferred to the stretcher.

IMPLANTS:
Depuy Attune Femur size 7 cementless
DePuy attune tibia size 7 fixed-bearing, 50 mm stem
DePuy attune patella size 35
DePuy attune tibial insert size 7 x 5 mm

A 22 modifier will be applied to this case secondary to the significant increase in complexity due to the patient's pre-existing significant varus deformity necessitating alteration in bony cuts including preferential varus tibia resection as well as a medial tibial reduction osteotomy and additional medial peel to free up the MCL and allow for a stable extension gap. Additionally, the patient's overall size and limited soft tissue excursion significantly increased the complexity and time required for this case. Overall additional time required for this case over 1 hour

**Complications:** None

**Specimens:** None

**Estimated Blood Loss:** less than 50 ml

**VTE Prophylaxis:** As ordered post-op

**Disposition:** Postoperatively, patient will be taken to the postoperative care area. Will plan for admission to 23-hour observation. Patient will work with physical therapy today at least once, possibly twice pending timing and staff availability. Patient will work with physical therapy again tomorrow at least once prior to discharge. Aspirin 81 mg twice daily for DVT prophylaxis. Follow-up with me in 2 weeks in Mobile

Electronically signed by *No name on file* 3/5/2025 11:05 AM

Electronically signed by Robert M Hulick, MD at 3/5/2025 4:12 PM

Admission (Discharged) on 3/5/2025    *Note shared with patient*

Mitchell, Willie J (MRN E529009) Encounter Date: 02/25/2025

## Care Timeline

| 03/05 0545 | Admitted (Observation) 0545 |
| 03/05 0703 | RIGHT TOTAL KNEE REPLACEMENT |
| 03/05 1420 | Discharged 1420 |

# Responsible Party Ledger

**Saraland Smiles**
1097 Industrial Parkway, Ste. E
Saraland, AL 36571
Ph : 251-675-3070

| | |
|---|---|
| Date : | 4/15/2025 |
| Account # : | 90057171 |
| Account Balance : | 2,312.00 |
| Billing Type : | Collection |
| Office # : | SRL305 |

WILLIE  MITCHELL
2104 WOLF RIDGE RD
APT 18
WHISTLER, AL 36612

Tuesday, April 15, 2025

| Date | Chart# | Patient Name | Th | Surf | Prdr | Code | Description | Charges | Credits | Curr. Bal. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Previous Balance | | 20.00 | |
| 6/15/2023 | | Mitchell, Willie | | | 1351 | PP010 | PMT PAT-Direct Deposit... | | -20.00 | 0.00 |
| | | Mitchell, Willie | 18 | | 0950 | D6740 | Retainer Crown - Porce... | 781.00 | | 781.00 |
| | | Mitchell, Willie | 19 | | 0950 | D6245 | Pontic Porcelain/Ceram... | 778.00 | | 1,559.00 |
| | | Mitchell, Willie | 20 | | 0950 | D6740 | Retainer Crown - Porce... | 781.00 | | 2,340.00 |
| | | Mitchell, Willie | | | 1351 | D1110 | Prophylaxis - Adult | 64.00 | | 2,404.00 |
| | | Mitchell, Willie | | | 1351 | D1206 | Topical Application Of... | 29.00 | | 2,433.00 |
| 6/16/2023 | | Mitchell, Willie | | | MDP-AL | CLM-P | Pri Claim - Sent (2433.00) Closed: 06/27/2023 | | 0.00 | 2,433.00 |
| 6/24/2023 | | Mitchell, Willie | | | *** | PINS8 | PMT INS - ERA 835 (Dos:06/15/23) | | -29.00 | 2,404.00 |
| 7/7/2023 | | Mitchell, Willie | | | 0950 | PP010 | PMT PAT-Direct Deposit... | | -92.00 | 2,312.00 |
| | | Mitchell, Willie | 18 | | 0950 | ZD0101 | Deliver Bridge | 0.00 | | 2,312.00 |
| | | | | | | | Total : | 2,433.00 | -141.00 | |

Account Balance  as of  7/7/2023    : 2,312.00

Summary :

| | |
|---|---|
| Total Charges : | 2,433.00 |
| Total Payments : | -141.00 |
| Total Adjustments : | 0.00 |

Family Member Balances as of:  7/7/2023
Willie  Mitchell :          2,312.00

YTD Charges : 2,765.00      YTD Pat Payments :  112.00      YTD Ins Payments : 341.00



Exhibit B + C

1:25-CV-4417



17

1          IN THE STATE COURT OF FULTON COUNTY
                   STATE OF GEORGIA
2

3    STATE OF GEORGIA,                    )
                                          )
4                                         )    CRIMINAL CASE
     VS.                                  )    NO. 07-CR-327264
5                                         )
     WILLIE MITCHELL,                     )    CHARGES:
6                                         )    DUI – ALCOHOL – LESS SAFE
                                          )    DISREGARD OF OFFICER'S
7              DEFENDANT.                 )    DIRECTION
     _____         )    IMPROPER U-TURN
8

9    EXCERPT

                                    TRIAL

10
                             VOLUME II OF II

11

12   BEFORE THE HONORABLE SUSAN E. EDLEIN, JUDGE, AND JURY, FULTON

13   COUNTY JUSTICE CENTER TOWER – COURTROOM 2A STATE COURT OF

14   FULTON COUNTY, ATLANTA, GEORGIA  ON OCTOBER 1-2, 2009

15

16   APPEARANCES OF COUNSEL:

17

18            SOLICITOR GENERAL OFFICE:
                 FOR THE STATE
19            BY: JAMIE MACK, ESQ.
                 ASSISTANT SOLICITOR GENERAL
20

21            STATE-APPOINTED COUNSEL
                 FOR THE DEFENDANT
22            BY: DENNIS J. MURPHY, ESQ.
                 425 EAST CROSSVILLE ROAD, SUITE 101
23               ROSWELL, GEORGIA  30075

24

IN THE STATE COURT OF FULTON COUNTY
STATE OF GEORGIA
CRIMINAL DIVISION

CASE NO. 7CR327264

STATE OF GEORGIA

VS

WILLIE J MITCHELL,
Defendant

## AFFIDAVIT OF ROBYN MITCHELL

Personally appeared before me, the undersigned officer duly authorized to administer oaths and take acknowledgement, Robyn C. Mitchell who being duly sworn, deposed and said the following:

1. I am a citizen of the United States, resident of Georgia and over the age of 18 year.

2. I am a former Trial Attorney with the US Department of Justice, Criminal Division, and former Assistant United States Attorney for the Northern District of Georgia Assigned to the Presidential Drug Enforcement Task Force. Having practiced many years thereafter in private corporate law firms, and as in-house counsel, I now manage regulatory compliance.

3. After receiving a letter from appointed counsel for my brother, Defendant in this case, saying that Mr. Ron Lloyd was not available on October 1 for trial due to a previous commitment, I called Mr. Ron Lloyd, the expert for the case previously engaged to investigate the case, and was told by Mr. Lloyd that he was not available October 1, 2009 but was available the next day, October 2, 2009. I then called Dennis Murphy

Exhibit K

but received his voice message. I left a message for appointed counsel telling him that

Mr. Lloyd was available on October 2. I never heard back from appointed counsel.

4. In discussion with appointed counsel prior to trial I told counsel that I had undergone

surgery and that my brother traveled to Augusta in my place to take my nephew, his

stepson, for orientation in National Guard Youth Challenge Program. Appointed

counsel told me that my testimony was not needed so that I was not called as a

witness.

Robyn C. Mitchell

Sworn to and subscribed before
me this 23rd day of October 2009

Notary Public

Notary Public, DeKalb County, Georgia
My Commission Expires Aug. 14, 2010

IN THE STATE COURT OF FOULTON COUNTY
STATE OF GEORGIA

CASE NO:07CR327264

Motion To Replace Attorney Dennis Murphy
Mr. Murphy has failed to meet with me about my case. He
has failed to show up for court. He has lied to me on more
than one occasion. I can not trust this man with my case but
I do trust Mr. Peter K. Odom. The address is The
Brookwood Exchange Site 1.5. 1708 Peachtree Street NW
Atlanta, Georgia 30309. Phone No: (404)872-0303 Fax
No:(404)872-6060.

For the past three years I have lost my tractor, two trailers a
2006 GMC pick up and my fourteen and seventeen year old
sons (I am a single father) lives have been retarded because
the Foulton Co. Police beat me and lied about it. My rights
to face my accusers with a fair and empirical jury is now
too late. I hope what has happen to me and my sons want
happen to other black men.

Respectfully Yours

Willie J. Mitchell
655 Whitehall Way
Roswell Ga 30076

Exhibit A

*Per Jury about Dash ean*
*and adio The all said I was*
*Lost Will I going to ser*
*To you guys*

INDEX

VOLUME II

OCTOBER 2, 2009                                                    PAGE

WITNESS:  JASON HIOTT
    DIRECT EXAMINATION BY MS. MACK
    CROSS EXAMINATION BY MR. MURPHY                               20
    REDIRECT BY MS. MACK                                          49
    RECROSS BY MR. MURPHY                                         60
                                                                  64

WITNESS:  BRIAN GIBBS
    DIRECT EXAMINATION BY MS. MACK
    CROSS EXAMINATION BY MR. MURPHY                               66
    REDIRECT BY MS. MACK                                          84
                                                                  93

WITNESS:  JASON WESCOTT
    DIRECT EXAMINATION BY MS. MACK                                95
    CROSS EXAMINATION BY MR. MURPHY                               100

WITNESS:  WILLIE MITCHELL
    DIRECT EXAMINATION BY MR. MURPHY                              103
    CROSS EXAMINATION BY MS. MACK                                 117

WITNESS:  GARRET MARKES
    DIRECT EXAMINATION BY MS. MACK                                132
    CROSS EXAMINATION BY MR. MURPHY                               134
    REDIRECT BY MS. MACK                                          134

INDEX OF EXHIBITS

STATE'S NO.                  DESCRIPTION                    PAGE ADMITTED

    1               GEORGIA IMPLIED CONSENT                     65

    2               MAP QUEST DIRECTIONS                        135

*The Jade Showed The Dash*
*Came To MS Mack mr Murphy*
*and Me at the same Time*

18

MWB

MACK - DIRECT - HIOTT

1    Q    HAD YOU EVER SEEN HIM?

2    A    NO, MA'AM.

3    Q    HAD YOU EVER MET HIM?

4    A    NO, MA'AM.

5    Q    NOW, YOU WERE IN A MARKED PATROL UNIT ON THE MORNING

6    OF AUGUST THE 27TH OF '06; IS THAT CORRECT?

7    A    YES, MA'AM.

8    Q    WAS THAT PATROL UNIT EQUIPPED WITH A VIDEO CAMERA?

9    A    YES, MA'AM.

10   Q    WAS THE VIDEO CAMERA FUNCTIONING PROPERLY PRIOR TO

11   YOU TAKING THAT UNIT OUT?

12   A    YES, MA'AM.

13   Q    AND HOW DO YOU KNOW THAT?

14   A    UM, BECAUSE IT SHOWS UP ON THE THING.  AND I HAVE

15   ACTUALLY WATCHED THIS VIDEO.  THE NEXT DAY I WATCHED IT WHEN

16   THE SUPERVISOR WAS ABLE TO GET IT OUT OF THE VEHICLE.

17   Q    SO, THE INCIDENT THAT YOU DESCRIBED AS HAVING

18   OCCURRED WITH MR. MITCHELL, THE DEFENDANT, WAS CAPTURED ON

19   VIDEO?

20   A    UM, FROM MY RECOLLECTION OF THE VIDEO, IT WAS -- OUR

21   CAR WAS ACTUALLY -- IT WAS -- OUR CAR WAS SITTING THERE AT THE

22   TRAFFIC SAFETY CHECKPOINT.  IT WAS A LITTLE BIT, IT WAS, I

23   WOULDN'T SAY FOGGY, BUT THE WINDSHIELD HAD FOGGED OVER SO YOU

24   COULD KIND OF SEE.  IT WAS NOT EXTREMELY CLEAR.  IT WAS MORE

25   THE AUDIO THAT WAS USEFUL.

MACK - DIRECT - HIOTT

1    Q    OKAY.

2              WHERE IS THAT VIDEO TODAY?

3    A    I HAVE NO IDEA.

4    Q    WHEN WAS THE LAST TIME YOU VIEWED THAT VIDEO?

5    A    IT WOULD HAVE BEEN AUGUST -- IT WOULD HAVE BEEN

6    8-28-06.

7    Q    THE NEXT DAY?

8    A    YES, MA'AM.

9    Q    WHERE WAS THE VIDEO PLACED AFTER IT WAS RETRIEVED

10   FROM YOUR VEHICLE?

11   A    OUR PROCEDURES, WHEN WE TURN IN VIDEOS FOR EVIDENCE,

12   IS TO PLACE THEM INTO THIS WHITE ENVELOPE BASICALLY THE SIZE

13   OF A VHS TAPE.  IT WAS VHS AT THAT TIME.  I PLACED THE VIDEO

14   AT THAT TIME, PUT ALL THE INFORMATION ON THE TAPE, PLACED IT

15   INTO THE EVIDENCE LOCKER.

16   Q    AND HAVE YOU SEEN THE VIDEO SINCE THAT TIME?

17   A    NO, MA'AM.

18   Q    WHAT'S THE NORMAL PROCEDURE WHEN PROPERTY IS PLACED

19   INTO THE EVIDENCE LOCKER?

20   A    AT THE TIME, THAT WAS THE PROCEDURE.

21   Q    IS THAT WHERE IT'S KEPT UNTIL SUCH TIME AS IT'S

22   NEEDED FOR TRIAL?

23   A    YES, MA'AM.  I'M NOT EXACTLY SURE WHERE THEY KEEP IT

24   IN THE EVIDENCE ROOM, BUT YES.

25   Q    DID YOU EVER TRY TO RETRIEVE THE VHS?

47

MWB

MACK - DIRECT - HIOTT

1    A    YES.

2    Q    WHAT WAS THE INFORMATION YOU LEARNED AS A RESULT OF

3    TRYING TO RETRIEVE?

4    A    THE EVIDENCE TECHNICIAN AT THE TIME TOLD ME THEY

5    COULD NOT LOCATE THE VIDEO.

6    Q    AND WAS THERE ANYTHING UNUSUAL GOING ON WITH THE

7    EVIDENCE ROOM AROUND THAT TIME?

8    A    YES, MA'AM, THEY HAD MOVED TO A SEPARATE BUILDING

9    OUTSIDE OF THE DEPARTMENT THAT WAS BUILT IN THE BACK PARKING

10    LOT, BASICALLY.

11    Q    SO, THERE WAS A MOVE?

12    A    YES, MA'AM.

13    Q    IN BETWEEN THE TIME YOU LEFT THE VIDEO IN THE

14    EVIDENCE LOCKER AND THE TIME YOU WENT TO RETRIEVE IT?

15    A    YES, MA'AM.

16    Q    AND IS THAT HOW THE CUSTODIAN OF THE PROPERTY

17    ACCOUNTED FOR THE POSSIBLE ABSENCE OF THE VIDEO?

18    A    THEY DIDN'T GIVE ME A REASON.

19    Q    SO, YOU HAVE NEVER BEEN ABLE TO LOCATE THE VIDEO?

20    A    NO, MA'AM.

21    Q    SO, OFFICER HIOTT, AFTER YOU LEFT THE DEFENDANT WITH

22    THE DAY-SHIFT POLICE OFFICER, WHAT DID YOU DO AFTER THAT?

23    A    WE WENT BACK.  I WROTE THE REPORT AND WENT HOME.

24    Q    YOU DID PREPARE A REPORT REGARDING THIS INCIDENT?

25    A    YES, MA'AM.

48

MWB

Case 1:25-cv-04417-JPB    Document 2-1    Filed 08/13/25    Page 32 of 42
Case 1:25-cv-01186-TCB    Document 5    Filed 03/27/25    Page 24 of 31

143

CLOSING STATEMENTS

1    FOUR-MINUTE INVESTIGATION. OFFICERS THAT WERE ON THE

2    CHECKPOINT WERE NOT DUI SPECIALISTS. AGAIN, THE FACTS ON

3    THE GROUND ARE THAT MR. MITCHELL DIDN'T COMMIT ANY OF

4    THESE CRIMES, AND YOU SHOULD FIND A VERDICT OF NOT GUILTY

5    ON ALL THREE COUNTS.

6         THANK YOU.

7              THE COURT: MS. MACK.

8              MS. MACK: THANK YOU, YOUR HONOR.

9         GOOD AFTERNOON, MEMBERS OF THE JURY PANEL, I'M SURE

10    YOU'RE PLEASED TO KNOW THAT THIS CASE IS NOT GOING TO

11    LAST NEARLY AS LONG AS WE THOUGHT IT WOULD. SO, YOU

12    SHOULD BE OUT RELATIVELY QUICKLY. AGAIN, THIS IS THE

13    POINT DURING THE TRIAL WHERE WE'RE ABLE TO MAKE CLOSING

14    ARGUMENTS TO YOU. THIS IS WHEN EACH PARTY HAS AN

15    OPPORTUNITY TO COME BEFORE YOU AND TELL YOU WHAT WE

16    BELIEVE OUR EVIDENCE HAS SHOWN. WE CAN CREATE INFERENCES

17    FROM THE EVIDENCE THAT YOU RECEIVE FROM THAT JURY STAND,

18    AS WELL AS ASK YOU TO INFER AND COME UP WITH CONCLUSIONS

19    ABOUT WHAT YOU THINK HAPPENED.

20         THE JUDGE IS GOING TO TELL YOU, WHEN SHE GIVES YOU

21    THE LAW, THAT YOU, AS THE JURORS, ARE THE SOLE JUDGES OF

22    THE CREDIBILITY OF WITNESSES. YOU DECIDE WHICH WITNESSES

23    YOU BELIEVE. YOU DECIDE, BASED ON THE TESTIMONY THAT

24    YOU'VE HEARD FROM THAT WITNESS STAND, WHAT HAPPENED ON

25    MANSELL ROAD ON AUGUST THE 27TH OF 2006, AT APPROXIMATEL

Case 1:25-cv-04417-JPB    Document 2-1    Filed 08/13/25    Page 33 of 42
Case 1:25-cv-01186-TCB    Document 5    Filed 03/27/25    Page 25 of 31

144

CLOSING STATEMENTS

1  1:50 IN THE MORNING.  YOU DECIDE WHAT HAPPENED.  BASED ON

2  THE EVIDENCE YOU HEARD, YOU DECIDE WHICH WITNESSES ARE

3  WORTHY OF YOUR BELIEF.

4       AND I'M SURE YOU'RE ALL FAMILIAR WITH THE SAYING, IF

5  IT LOOKS LIKE A DUCK, WALKS LIKE A DUCK, QUACKS LIKE A

6  DUCK, THEN IT'S A DUCK.  SO, MR. MITCHELL WAS A DRUNK

7  DUCK.  AND LET'S LOOK AT THE SMOKE SCREEN THAT DEFENSE

8  COUNSEL IS TRYING TO PUT BEFORE YOU.  A FOUR-MINUTE

9  INVESTIGATION.  USE YOUR COMMON SENSE AND ASK YOURSELVES

10  HOW LONG DOES IT TAKE FOR YOU TO FORM AN OPINION THAT A

11  PERSON THAT WAS OBVIOUSLY AS INTOXICATED AS MR. MITCHELL

12  WAS, TO SAY THAT PERSON'S DRUNK?  DOES IT TAKE A MINUTE?

13  MAYBE IT TAKES 30 SECONDS.  WHEN YOU OBSERVE A PERSON TO

14  HAVE A VERY, VERY STRONG ODOR OF AN ALCOHOLIC BEVERAGE

15  COMING FROM HIS PERSON, HEAVILY SLURRED SPEECH, BLOODSHOT

16  AND GLASSY EYES, COMBATIVE, AFTER HAVING OBSERVED THE

17  PERSON COMMIT NUMEROUS TRAFFIC INFRACTIONS, UNSTEADY ON

18  HIS FEET, HOW LONG WOULD IT TAKE YOU TO REACH THE

19  CONCLUSION THAT THAT PERSON WAS INTOXICATED OR UNDER THE

20  INFLUENCE OF ALCOHOL?  USE YOUR COMMON SENSE.  SO, THE

21  LENGTH OF THAT STOP, DOES IT MATTER?

22       AND LET'S TALK ABOUT THE POSITIONING OF OFFICERS

23  HIOTT AND OFFICER GIBBS, OR DETECTIVE GIBBS AT THAT

24  SAFETY CHECKPOINT STOP.  THEY TESTIFIED TO YOU, FIRST

25  HIOTT AND THEN DETECTIVE GIBBS, DETECTIVE GIBBS,

## CLOSING STATEMENTS

1    HIOTT AND THEN DETECTIVE GIBBS, DETECTIVE GIBBS,

2    DETECTIVE GIBBS, THAT THEY WERE AT THE END OF THE

3    ROADBLOCK, WHICH IN THEIR LANGUAGE MEANT THAT THEY WERE

4    STANDING AT THE POINT WHERE THE CARS WERE SUPPOSED TO

5    COME TO THEM FOR THEM TO CONDUCT THEIR SAFETY CHECK.   SO,

6    IF OFFICER BERGER IS AT THE BEGINNING OF THE TRAFFIC

7    SAFETY CHECKPOINT, THEY WOULD BE FACING OFFICER BERGER,

8    SO THEY WOULD HAVE HAD THE PERFECT VANTAGE POINT TO SEE

9    THAT OFFICER BERGER, AS THEY BOTH TESTIFIED, MOTIONED THE

10   RED SUV THAT THE DEFENDANT WAS DRIVING TO PULL FORWARD

11   AND CONTINUE TO PROCEED THROUGH TO THE SAFETY CHECKPOINT.

12   THEY WERE NOT LOOKING AT THE BACK -- OFFICER BERGER WAS

13   NOT LOOKING AT THE BACK OF OFFICER HIOTT'S AND DETECTIVE

14   GIBBS' HEAD.   THEY WERE FACING HIM.   THEY COULD SEE HIS

15   GESTURING TO THE DEFENDANT, WHO IS DRIVING THE RED SUV,

16   TO PULL FORWARD AND PROCEED THROUGH THE TRAFFIC SAFETY

17   POINT.   AND THAT IS WHAT THEY INDEED TESTIFIED TO.   THEY

18   OBSERVED OFFICER BERGER MOTIONING AND TELLING THE

19   DEFENDANT TO MOVE FORWARD.

20       AND THE TESTIMONY, THE UNDISPUTED TESTIMONY, WAS

21   THAT THE DEFENDANT STOPPED AND THEY WERE APPROXIMATELY

22   THREE VEHICLES IN FRONT OF HIS.   THE DEFENDANT STOPPED,

23   TURNED AROUND, OR DIDN'T TURN AROUND, HE BACKED UP.   HE

24   WAS IN THE RIGHT-HAND LANE.   THERE WAS A SECOND LANE TO

25   HIS LEFT.   THEN, THERE WAS A GRASSY MEDIAN, WITH TWO

145

MWB

Case 1:25-cv-04417-JPB    Document 2-1    Filed 08/13/25    Page 35 of 42
Case 1:25-cv-01186-TCB    Document 5    Filed 03/27/25    Page 27 of 31

146

## CLOSING STATEMENTS

1    OF THE GRASSY MEDIAN. THE DEFENDANT WENT FROM THE FAR

2    RIGHT LANE, ACCORDING TO OFFICER RIOTT'S TESTIMONY,

3    TURNED, CROSSED OVER THE LANE THAT WAS NEXT TO HIM, WENT

4    OVER THE GRASSY MEDIAN, AND TURNED ONTO THE LANE ONTO

5    MANSELL ROAD GOING IN THE OPPOSITE DIRECTION. AND YOU

6    HEARD DETECTIVE GIBBS TELL YOU IT IS NEVER LEGAL TO CROSS

7    OVER A GRASSY MEDIAN. AND, AGAIN, YOU SHOULD USE YOUR

8    COMMON SENSE AND YOUR OWN EVERYDAY EXPERIENCES. IT IS

9    ABSOLUTELY UNACCEPTABLE TO, FIRST OF ALL, MAKE A

10   LEFT-HAND TURN FROM THE FAR RIGHT LANE. THAT WAS ONE

11   MANIFESTATION THAT SOMETHING WAS AWRY WITH THE DRIVER OF

12   THAT VEHICLE, TO TURN OVER A MEDIAN, A SECOND INDICATION

13   THAT THAT IS NOT SOMETHING THAT ORDINARY DRIVERS DO, TO

14   THIRDLY MAKE THAT U-TURN AND GO IN THE OPPOSITE

15   DIRECTION. SEALS THE DEAL FOR THE OFFICERS. THEY DECIDED

16   THIS INDIVIDUAL'S BEHAVIOR IS SUSPICIOUS, AND THEY GOT IN

17   THEIR CARS BECAUSE IN THEIR EXPERIENCE THAT MEANT HE WAS

18   TRYING TO AVOID THE ROADBLOCKS AND PERHAPS THERE WAS SOME

19   CRIMINAL ACTIVITY AFOOT. SO, THEY GET INTO THEIR VEHICLE

20   AND THEY PURSUE THE DEFENDANT. SO, NOW WE NOT ONLY HAVE

21   ONE INDICATOR THAT THERE IS SOMETHING WRONG WITH THE

22   DRIVER IN THAT VEHICLE, WE HAVE THREE. THAT BACKING UP

23   FROM THE ROADBLOCK; THAT TURNING AND GOING OVER THAT

24   GRASSY MEDIAN, AND THAT MAKING THAT U-TURN. AND THEN

25   WHEN THE OFFICERS GOT BEHIND HIM, HE WAS WEAVING IN AND

EX1E

# MEMORANDUM

**TO:**    Sgt. S. Browning

**FROM:**    Officer J. Wescott

**DATE:**    12/17/2008

**RE:**    Willie Jay Mitchell

The only contact that I have had in any pe  onal or professional way with WILLIE JAY MITCHELL was in September 2006 as a  ember of the Roswell Police Department accident investigation crash team. I was c  lled out on a serious injury accident that occurred in the intersection of Georgia Hi  way 92 and Crabapple Road. Upon calling in service the primary investigating Office  J. Sanders called me via phone and advised me that one of the drivers, WILLIE JAY N  TCHELL, had already been transported to North Fulton Hospital via ambulance. Off  er J. Sanders advised me that he wanted me to respond to North Fulton Hospital to che  k on the status of WILLIE JAY MITCHELL.

Upon arrival at North Fulton Hospital and  aking contact with MITCHELL I could smell an extremely strong odor of an alcoh  lic beverage on and about MITCHELL'S person. I immediately read MITCHELL G  orgia Implied Consent Notice and asked for a blood test. MITCHELL, who was consciou  advised that he would take a blood test. After the blood test was complete I transpc  ed the blood test kit to the Roswell Police Department and secured it in the evidence  frigerator. No other contact was made with MITCHELL after this incident.

## AFFIDAVIT OF WILLIE JOE MITCHELL

I, Willie Joe Mitchell, having been duly sworn do hereby state that the following:

1. My name is Willie Joe Mitchell and I am 18 years of age.

2. I was a passenger in the car driven by my father, Willie Mitchell, in September that was involved in an accident at Crabapple and Crossville Roads in Roswell, Georgia.

3. I was riding in the front passenger seat.

4. We were in the left turn lane to go from Crossville onto Crabapple.

5. The Turning light was on and cars started turning left.

6. I Saw the light as my father went to turn and it was the green arrow for turning left when he turned.

7. A van travelling very fast through the light on Crossville then hit us.

8. A case in civil court was brought for me against the driver of the van before my 18th birthday but he could not be found.

9. Now at 18 years old, I have brought an action against the driver of the van again and he still cannot be found.

10. I hereby certify that, to the best of my knowledge and belief, all statements made in this document are true and correct.

_(signature)_

Willie Joe Mitchell

1 – 12 – 11

Date

Subscribed and sworn to before me on this 12 day of January, 2011, Willie Joe Mitchell, who produced Georgia drivers license as proof of identification.

_(signature)_

Notary Signature

SHARON PATTERSON
NOTARY
MY COMM. EXP.
SEPTEMBER 4, 2011
PUBLIC
COUNTY, GA.

07/05/2022 11:... FAX

153

### CLOSING STATEMENTS

1   BREATH, URINE OR BODILY SUBSTANCES AT YOUR OWN EXPENSE

2   AND FROM QUALIFIED PERSONNEL OF YOUR OWN CHOOSING." YOU

3   GOT TO UNDERSTAND THE WORD "AFTER." THE REASON THE

4   OFFICERS KEPT TELLING YOU THAT HE REFUSED TO TAKE THE

5   STATE ADMINISTERED BREATH TEST WAS BECAUSE THEY REQUESTED

6   THAT HE TAKE THE BREATH TEST. HIS RESPONSE WAS, "I WANT

7   A BLOOD TEST." THAT'S AKIN TO A REFUSAL BECAUSE YOU

8   CAN'T GET THE BLOOD TEST OF YOUR OWN CHOOSING UNTIL AFTER

9   YOU SUBMIT TO THE STATE'S BREATH TEST, AND THAT'S THE LAW

10  IN THE STATE OF GEORGIA. THAT'S WHY THEY READ THAT

11  IMPLIED CONSENT TO HIM, TO ASK HIM WILL YOU CONSENT. AND

12  IT'S ONLY AFTER YOU CONSENT TO TAKE THE STATE TEST, THAT

13  YOU'RE ABLE TO REQUEST THAT INDEPENDENT BLOOD TEST. BUT,

14  YOU DON'T GET IT IF YOU DON'T TAKE THE STATE'S TEST. IT

15  WAS CLEAR. USE YOUR COMMON SENSE. IT'S ALL A SMOKE

16  SCREEN. THIS BUSINESS ABOUT THE BRIEF STOP AND HOW LONG,

17  HOW MUCH OF A DUI INVESTIGATION COULD HAVE BEEN CONDUCTED

18  IS NONSENSE. IF IT LOOKS LIKE A DUCK, WALKS LIKE A DUCK,

19  QUACKS LIKE A DUCK, IT'S A DUCK. IT DOESN'T TAKE LONG TO

20  MAKE A DETERMINATION THAT A PERSON IS INTOXICATED.

21      OFFICER WESCOTT, THE MOST IMPARTIAL WITNESS EVER,

22  HAD NO — HE'S NOT EVEN WITH THE ALPHARETTA POLICE

23  DEPARTMENT. HE'S WITH THE ROSWELL POLICE DEPARTMENT. HE

24  JUST HAPPENED TO BE DOWN AT GRADY HANDLING HIS OWN ARREST

25  SITUATION, AND DEALING WITH HIS OWN ARRESTEE. HE'S A

CLOSING STATEMENTS

1   PRIOR DUI TASK FORCE OFFICER.  HE'S ABSOLUTELY

2   ACCUSTOMED, AND HE TESTIFIED TO YOU, THAT HE'S ABSOLUTELY

3   ACCUSTOMED TO DETERMINE WHETHER OR NOT PEOPLE ARE

4   INTOXICATED TO THE POINT WHERE THEY ARE A LESS SAFE

5   DRIVER.  HE TOLD YOU HE SAT ACROSS A DESK FROM

6   MR. MITCHELL, THE DEFENDANT, MAYBE SIX FEET, FOUR- TO

7   SIX-FEET AWAY, AND HE COULD SMELL A STRONG ODOR OF

8   ALCOHOL COMING FROM HIM.  HE NOTICED THAT HIS SPEECH WAS

9   HEAVILY SLURRED.  YOU DON'T HAVE TO UNDERSTAND A PERSON'S

10  SPEECH PATTERN TO KNOW THAT THEIR SPEECH IS SLURRED.  YOU

11  ABSOLUTELY DO NOT.  IF A PERSON'S SPEECH IS SLURRED, ANY

12  ONE OF US IS ABLE TO MAKE THAT DETERMINATION AFTER

13  SPEAKING WITH THEM FOR A BRIEF PERIOD.  AND WE KNOW THAT

14  MR. MITCHELL DID A LOT OF TALKING THAT MORNING.  HE DID A

15  LOT OF CURSING AND FUSSING AND THREATENING THAT MORNING.

16  SO, ALL OF THE WITNESSES HAD AMPLE OPPORTUNITY TO MAKE A

17  DETERMINATION THAT HIS SPEECH WAS SLURRED.

18      OFFICER WESCOTT SAID HE KNEW -- HE COULD TELL HE WAS

19  INTOXICATED, AND HE WAS VERY COMBATIVE.  AND USE YOUR OWN

20  LIFE EXPERIENCES TO HELP YOU UNDERSTAND, WHEN YOU'VE SEEN

21  AN INTOXICATED PERSON, SOMETIMES THEY TEND TO BE VERY

22  LOUD, VERY BOISTEROUS.  AND THAT IS HOW EVERYONE

23  DESCRIBED HIS BEHAVIOR, IN ADDITION TO THE STRONG ODOR OF

24  ALCOHOL, THE GLASSY AND BLOODSHOT EYES, AND THE SLURRED

25  SPEECH AND BEING UNSTEADY ON HIS FEET.  AND OFFICER

MST

CHARGE

1    WESCOTT ALSO TOLD YOU THAT HIS EYES WERE VERY GLASSY.

2    MEMBERS OF THE JURY, CLEARLY THE DEFENDANT WAS

3    INTOXICATED ON THAT MORNING THAT HE WAS STOPPED. AND YOU

4    CAN INFER THAT FROM THE FACT THIS WAS THE DAY BEFORE HIS

5    BIRTHDAY THAT HE WAS OUT CELEBRATING. YOU KNOW HE WAS

6    DRIVING A VEHICLE. WAS HE A SAFE DRIVER? YOU HEARD THE

7    EVIDENCE. WHEN YOU GO BACK TO THAT JURY ROOM, USE YOUR

8    INDIVIDUAL ABILITY TO RECALL, AND YOUR COLLECTIVE ABILITY

9    TO RECALL AND REMEMBER WHAT THE EVIDENCE WAS. HE WAS

10   DRUNK. . HE WAS DRIVING. AND HE WAS ABSOLUTELY A LESS

11   SAFE DRIVER ON THE ROADS THAT MORNING. HE COMMITTED

12   SEVERAL TRAFFIC INFRACTIONS. HE MADE THAT U-TURN. AND

13   HE ABSOLUTELY DID NOT ABIDE BY THE DIRECTIVES GIVEN TO

14   HIM FROM ANY OF THE OFFICERS.

15   REMEMBER, IF IT LOOKS LIKE A DUCK, WALKS LIKE A

16   DUCK, QUACKS LIKE A DUCK, THEN IT'S A DUCK. HE WAS

17   DRUNK. AND HE WAS DRIVING. NOT ACCEPTABLE. GO BACK

18   THERE AND YOU RENDER A DECISION LETTING THE DEFENDANT

19   KNOW, NOT ACCEPTABLE. I DON'T CARE WHAT HOUR YOU'RE OUT

20   THERE, NOT ACCEPTABLE TO BE OUT THERE DRIVING LIKE THAT

21   UNDER THOSE CONDITIONS. FIND HIM GUILTY BECAUSE HE'S A

22   DUCK AND HE WAS A DRUNK DUCK ON THAT MORNING.

23   THANK YOU.

24   THE COURT: THANK YOU, COUNSEL.

25   LADIES AND GENTLEMEN OF THE JURY, YOU HAVE HEARD THE

MWB



U.S. Department of Homeland Security
Intelligence and Analysis
Springfield, VA 20598

**Transportation
Security
Administration**

February 16, 2024

WILLIE MITCHELL
2104 WOLF RIDGE RD APT 25
WHISTLER, AL 36612-1654

Re: Preliminary Determination of Ineligibility, HME Application, Case Number: 11634655

Dear WILLIE MITCHELL:

The Transportation Security Administration (TSA) has received your application for a Hazardous Materials Endorsement (HME). After review of the information received as a result of your application, TSA has made a preliminary determination that you might not be eligible for an HME because of your criminal history, pursuant to Title 49, Code of Federal Regulations (C.F.R.), sections 1572.103(a), (b), and/or (c) (for criminal offenses), as described below:

**Convictions:**

Terroristic Threats and Acts, in Fulton County, Georgia, on or about February 17, 2011, and sentenced to serve three years probation supervision.

If you were not convicted of a disqualifying offense or you were convicted a long time ago, you *may* qualify for an appeal.  See the enclosed General Instructions for Criminal Disqualifications, Section 1, regarding *appeals*.

If the information above is correct, you may be able to obtain an HME in some cases.  See the enclosed General Instructions for Criminal Disqualifications, Section 2, regarding *waivers*.

If you cannot tell whether you should apply for an appeal or a waiver, you may request both. Read the enclosed directions carefully before applying for an appeal or a waiver.

You may also request the releasable materials on which TSA has based its preliminary determination of ineligibility. To do so, please check the appropriate box on the enclosed HME Response Cover Sheet and return it to TSA.

In any case, you must reply within 60 days from the date you receive this letter.  You may send TSA the necessary documents or submit a request for an extension of time to reply.  If you do not reply within 60 days or receive an extension of time from TSA, TSA's preliminary determination of ineligibility will become final and *you will not be granted an HME*.

Even if your application is finally denied, you may submit a new application for an HME *at any time*.

Open in app ↗

Sign up    Sign In

 Q  Search Medium

✦ Member-only story

# Buck Breaking: The Rape and Beating of Black Enslaved Men to Make Them Compliant

## How Prevalent Was This Practice in America?

 William Spivey · Follow
Published in Black History Month 365
7 min read · Jan 24

▶ Listen      ⬆ Share



Picture on Pixabay